Approved: _____
SAMUEL L. RAYMOND / VLADISLAV VAINBERG
Assistant United States Attorney

Before:  THE HONORABLE
         United States Magistrate Judge
         Southern District of New York

- - - - - - - - - - - - - - - - - - x

**23 MAG 563**

UNITED STATES OF AMERICA

 - v. -

NADIM AHMED,

            Defendant.

- - - - - - - - - - - - - - - - - - x

SEALED COMPLAINT

Violation of 18 U.S.C. §§ 2314 & 2

COUNTY OF OFFENSE: Manhattan

SOUTHERN DISTRICT OF NEW YORK, ss.:

ALI AMHAZ-STRICKLAND, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

COUNT ONE

(Interstate Transportation of Stolen Property)

1.  In and about 2018, in the Southern District of New York and elsewhere, NADIM AHMED, the defendant, knowingly transported, transmitted, transferred, and caused to be transported, transmitted, and transferred, in interstate and foreign commerce, money of the value of $5,000 and more, knowing the same to have been stolen, converted, and taken by fraud, to wit, AHMED converted over $100,000 in New York state, which he subsequently transferred from a bank account in New York, New York to a bank account in California.

(Title 18, United States Code, Sections 2314 & 2)

The bases for my knowledge and the foregoing charge are, in part, as follows:

2.      I am a Special Agent with the FBI.  I am familiar with the facts and circumstances set forth below from my participation in the investigation of this case, including my participation in interviews and my review of documents and records; and from my conversations with other law enforcement officers, as well as attorneys, and staff, including attorneys and staff at the United States Citizenship and Immigration Services ("USCIS") and Securities and Exchange Commission ("SEC").  Because this Complaint is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Background on the "EB-5 Program"

3.      From my review of documents from USCIS, I have learned that USCIS operates the "EB-5 Program".  The EB-5 Program allows foreign nationals to obtain a U.S. visa by investing in domestic projects that would create or preserve a certain number of jobs for U.S. workers.  Foreign nationals can qualify to obtain U.S. residency if they invest hundreds of thousands of dollars in specific private projects, as approved by USCIS.  As part of the EB-5 Program, companies must spend the money received from foreign investors on those specifically designated projects, in order to create the required number of jobs for U.S. workers, as determined by USCIS.  Additionally, it is a requirement of the EB-5 Program that an investment be "at risk" – in other words, an investor can only qualify for the visa by making an actual investment that can potentially earn or lose money.

## AHMED's Companies

4.      From my involvement in this investigation, including my review of a deposition taken by the Securities and Exchange Commission ("SEC") in March 2017 in which NADIM AHMED, the defendant, testified under oath, I have learned that as of about March 2017, NADIM AHMED, the defendant, was a 66 percent owner and Executive Chairman of a company ("Company-1") which in turn is a 60 percent owner of another company ("Company-2").  AHMED also was an owner and operator of another company ("Company-3").  Company-2 is a company which participates in the EB-5 Program, by soliciting investments from foreign nationals, for a minimum investment of $500,000.  According to the SEC

2

deposition and public records, Company-1, Company-2, and Company-3 are all headquartered in New York City.

5. I have reviewed documents which indicate that Company-3 was sued by the SEC in an administrative proceeding for illegally brokering sales of securities under the EB-5 Program. Company-3 settled that suit on or about March 5, 2018, for $544,744.20, under a specific case number (the "Case Number").

6. Among the records from USCIS which I have reviewed, I have reviewed an application for immigration status under the EB-5 Program submitted by Company-2. The application includes a signed Private Offering Memorandum between Company-2 and a man, "Investor-1," signed by Investor-1 on or about January 24, 2018 (the "Private Offering Memorandum"). I understand from speaking to a representative of USCIS that in order to arrange for immigration status under the EB-5 Program, companies must submit to USCIS the offering documents that are sent to investors. USCIS then reviews information, including the offering documents, to determine whether the investment is sufficient to qualify the investor for the requested visa. The Private Offering Memorandum states the following, among other things, and in sum and substance:

   a. Company-1 would act as "manager" for Company-2, to assist Company-2 with the proper administration of a project to develop a fleet of taxi and other vehicles in New York City. According to the Private Offering Memorandum, this project was "developed under the [] USCIS requirements" which would qualify the project as a "direct EB-5 project" and thus potentially allow the investor to obtain a U.S. visa;

   b. NADIM AHMED, the defendant, is listed as "Chairman" and "the principal managing member and executive chairman of [Company-1]";

   c. Individual-1 was an "EB-5 Member," whose investment (called a "Capital Contribution") would be used to purchase an "Interest" in Company-2;

   d. Individual-1 agreed to invest $500,000 as a Capital Contribution, and pay $50,000 in an administrative fee (the "Administrative Fee");

   e. Company-2 "may pay commissions or other fees to one or more immigration consultants, brokers, investment

3

advisors, or other parties in connection with the sale of Interests pursuant to this Offering," but "[a]ny such commissions or other fees paid to any party in connection with the sale of Interests pursuant to this Offering shall in no case be paid out of the proceeds of the EB-5 Members' Capital Contributions. [Company-2] intends to pay such commissions and fees, if any, from proceeds of the Administrative Fee, non-EB-5 Member equity, net cash flow from operations, and/or other financing, in compliance with the securities laws and regulations";

    f. Company-1 would be compensated from "unexpended portions of the Administrative Fee," "all profits of [Company-2] in excess of the Investors' recovered Capital Contributions" but only "after the EB-5 Members' Capital Contribution to [Company-2] is repaid from cash flow generated by operations of the Project";

    g. Any investments from investors "will be invested into [Company-2], the proceeds of which, together with other member's equity and other financing, if necessary, shall be used for the completion of the" specifically designated project of developing a fleet of taxi and other vehicles in New York City; and

    h. Company-2's management estimated the investments would create the required number of jobs to comply with USCIS rules regarding issuance of visas under the EB-5 Program and entitle any investors to a visa.

    7. I have reviewed bank records for the following accounts, among others (collectively, the "Bank Accounts"):

    a. An account held in the name of Company-2 at a bank located in the Southern District of New York, with account number ending 0269 (the "First Company-2 Account"). NADIM AHMED, the defendant, was one of two signatories on the First Company-2 Account;

    b. Another account held in the name of Company-2 at a bank located in the Southern District of New York, with account number ending 0072 (the "Second Company-2 Account"). AHMED was one of two signatories on the Second Company-2 Account;

    c. An account held in the name of Company-1 at a bank located in the Southern District of New York, with

4

account number ending 0080 (the "Company-1 Account"). AHMED was one of two signatories on the Company-1 Account;

        d.   An account held in the name of Company-3 at a bank located in the Southern District of New York, with account number ending in 6958 (the "Company-3 Account"). AHMED was one of two signatories on the Company-3 Account.

    8.   Among other things, the bank records show the following:

        a.   As of January 29, 2018, the First Company-2 Account had $45 in it. Investor-1 wired $510,000 to the First Company-2 Account on or about January 29, 2018.

        b.   As of February 5, 2018, the Second Company-2 Account had $2,064.89 in it. The First Company-2 Account transferred $450,000 to the Second Company-2 Account on or about February 5, 2018, resulting in a balance of approximately $452,000.

        c.   Soon after receiving this transfer, the Second Company-2 Account transferred $450,000 to the Company-1 Account.[1]

        d.   Soon after receiving this transfer, the Company-1 Account transferred $106,254.92 to the Company-3 Account.[2]

        e.   On February 5, 2018, the Company-3 Account wired $129,744.20 to a law firm (the "Law Firm"), with a note that said it related to the "Settlement" of Company-3 with the "SEC," with the Case Number.[3] Information from this wire shows that the wire was sent from the Company-3 account, located in

---

[1] Before the transfer from the Second Company-2 Account, the Company-1 Account had approximately $23,741.62 in it.
[2] Before the transfer from Company-1 Account, the Company-3 Account had approximately $30,266.85 in it.
[3] Additionally, on or about January 26, 2018, the Company-3 Account wired $260,000 to the Law Firm with the same note that said the wire related to the "Settlement" of Company-3 with the "SEC," with the Case Number, and on or about January 30, 2018, the Company-3 Account wired $160,000 to the Law Firm with the same note. In total, the Company-3 Account wired $549,744.20 to the Law Firm, which is $5,000 more than the amount of the SEC's settlement with Company-3.

5

the Southern District of New York, to the Law Firm's account, which has a routing number consistent with a bank located in California.

9. I have reviewed publicly available materials from the Law Firm's website, which shows that the Law Firm is based in California.

10. I have also reviewed materials from the SEC, which show that the Law Firm mailed a cashier's check dated March 13, 2018, in the amount of $544,744.20, to the SEC as payment for Company-2's settlement, from the Law Firm's address in California to an address in Oklahoma.

11. I understand, based on statements made by NADIM AHMED, the defendant, during his deposition before the SEC, as well as other documents obtained in this investigation including bank records, that Company-2 and Company-3 are wholly separate in their functioning, such that nonpayment of the SEC settlement by Company-3 would not have resulted in a bar on Company-2's ability to participate in the EB-5 program and pursue approved projects.

12. Based on, among other information, NADIM AHMED, the defendant's, ownership interests in Company-1, Company-2, and Company-3, and his role as one of two signatories on each of the Bank Accounts, I believe that AHMED directed the transfers among the accounts for Company-1, Company-2, and Company-3.

13. Based on the bank transfers and my conclusion that NADIM AHMED, the defendant, directed the transfers, I believe that AHMED, through Company-2, converted more than $5,000 of Investor-1's January 29, 2018, investment by transferring those funds to an account unconnected with the project which Investor-1 had invested, and then wired the money to the Law Firm in California from New York. Instead of using the money for the projects as described in the Private Offering Memorandum agreed to by Company-2 and Investor-1, AHMED instead arranged for at least $106,254.92 of Investor-1's money to be used for the settlement of Company-3's litigation with the SEC for prior EB-5 improprieties by that separate entity. In so doing, AHMED transferred hundreds of thousands of dollars from the First Company-2 Account to the Second Company-2 Account, then to the Company-1 Account, then to the Company-3 Account. AHMED then wired $129,744.20, including $106,254.92 of the converted money, to the Law Firm in California, which

subsequently used the funds to pay off Company-3's settlement with the SEC for prior EB-5 improprieties.

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of NADIM AHMED, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

*/s Ali Amhaz-Strickland*   (by Court with Auth)
_____
ALI AMHAZ-STRICKLAND
Special Agent
Federal Bureau of Investigation

Sworn to me through the transmission of this Affidavit by reliable electronic means, pursuant to Federal Rule of Criminal Procedure 4.1, this 23d th day of January, 2023

_____
THE HONORABLE SARAH L. CAVE
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK